**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**BUDNICK CONVERTING, INC.,**

      **Plaintiff/Counter-defendant,**

**v.**

**NEBULA GLASS INTERNATIONAL, INC.,
d/b/a GLASSLAM,**

      **Defendant/Counter-plaintiff,**

──────────────────────────────────────────────

**NEBULA GLASS INTERNATIONAL, INC.,
d/b/a GLASSLAM,**

      **Third Party Plaintiff,**

**v.**

**TESA TAPE, INC.,**

      **Third Party Defendant.**         **Case No. 09-cv-646-DRH**

## <u>ORDER</u>

**HERNDON, Chief Judge:**

      This case is sticky.  Nebula Glass International, Inc., d/b/a/ Glasslam ("Glasslam") sought to create a new product – the "Air-Tight" – that required, among other things, a specialized double-sided tape that could withstand certain conditions. Accordingly, Glasslam considered several products and ultimately decided to look into a tape – the 4965 – provided by Budnick Coverting, Inc. ("Budnick") but manufactured by Tesa Tape, Inc. ("Tesa").  Glasslam tested the tape to ensure it was

suitable for its application but then decided the tape, which had a red liner, needed a different liner with a different color and thickness. Accordingly, Glasslam worked with Budnick in finding a solution and ultimately decided upon a variation of the 4965 with the red liner (the "red tape") called the 4965 PV2 which had a white liner (the "white tape"). The white tape was represented to Glasslam as the same tape as the red tape with a different liner. As a result, Glasslam decided not to expend the resources to put the white tape through the same testing it had put the red tape through and ordered the tape from Budnick with plans to go into production. After the "Air-Tight" went into production, it was discovered that the white tape was not suitable for its intended use as it was failing Glasslam's customers' testing. As a result, Glasslam refused to pay for the white tape and this lawsuit involving Glasslam, Budnick, and Tesa ensued. Now before the Court are four motions for summary judgment, two by Budnick, two by Tesa, and Glasslam's appeal of magistrate judge decision. For the reasons that follow, Glasslam's appeal is denied, Budnick's motions for summary judgment are granted, and Tesa's motions for summary judgment are granted.

## I.  Background

Glasslam is a Florida company involved in the window glass industry as a supplier of component parts to other manufacturers. (Doc. 7). Glasslam is owned half by Steve Howes and half by Violet Howes. (Doc. 97-2, p. 2). During the time period relevant to this lawsuit, Mr. Howes was the CEO/president and Mrs. Howes was the vice president/secretary-treasurer of Glasslam. (Doc. 97-2, p. 3). In 2007,

Glasslam was working to create the "Air-Tight," a spacer for separating two pieces of glass for insulated glass for windows. (Doc. 97-25, p. 2). The "Air-Tight" was composed of three main parts: 1) a rubber gasket; 2) a double-sided adhesive tape that would go on both sides of the gasket; and 3) a mylar or moisture barrier tape on top of the gasket. (Doc. 99-5, p. 5). At issue here, is the double-sided adhesive tape.

To help it find the right products for the "Air-Tight" Glasslam worked with Budnick, whom it had done business with for years. (Doc. 97-1, p. 23). Budnick, an Illinois company, is a converter of adhesive tape products. Tape converting is the die cutting, slitting, and spooling of tape materials to customer-specific sizes. (Deterding p. 9). Glasslam primarily dealt with Budnick employees Ronald Miaskiewicz and Tom Birch. Birch did sales and business development for Budnick and was the primary day-to-day contact with Glasslam. (Doc. 97-4, p. 3, 5). Miaskiewicz was responsible for the sales, marketing, and the application engineering function of Budnick. (Doc. 97-11, p. 12). Ultimately, Glasslam became interested in the 4965 or red tape manufactured by Tesa. Tesa manufactures various types of tape, including adhesive acrylic tapes, and sells its products to distributors such as Budnick. (Doc. 33). Glasslam never dealt directly with Tesa, but went through Budnick to get Tesa's products. (Doc. 97-1, p. 23).

In August of 2007, after Budnick sent Glasslam a quote containing its terms and conditions of sale, which was customary between the parties, Glasslam purchased twenty-four spools of the red tape for testing purposes. (Docs. 97-8, 97-9). Those terms and conditions, which will be set forth more specifically where

applicable below, contained nine provisions governing: 1) "Prices"; 2) "Shipments"; 3) "Payments"; 4) "Cancellations, Returns, and Assignments"; 5) "Limited Warranty, Inspection and Claims"; 6) "Limits on Liability"; 7) "Force Majeure and Shortages"; 8) "Other Provisions"; and 9) "Exclusive Terms and Conditions." (Doc. 97-17, p. 2).

Testing that summer consisted of Steve Howes independent testing or "SHIT" testing.[1]  Mr. Howes is deemed an expert and owns several patents in the window and glass industry.  (Doc. 104-3, p. 9).  While Mr. Howes does not consider himself to be an expert with respect to adhesives used in the manufacture of insulated glass windows, he does consider himself to be "an expert in using the products and then testing the finished product to see whether or not it outgasses . . . and at what degree."  (Doc. 104-3, p. 9-10).  Outgassing is a well known problem in the glass industry (Doc. 104-3, p. 4).  It can cause a window to fog and can affect the coating on the glass itself.  (Doc. 95-1, p. 19-20).  Howes testified that SHIT testing is more stringent than industry standard testing.  (Doc. 97-1, p. 22).  Generally, Glasslam did not use a product unless Mr. Howes approved it first through testing.  (Doc. 97-1, p. 20).  The adhesive of the Tesa 4965 or the red tape passed Mr. Howes' testing, but he did not like the red liner because of its color and weight and because it wrinkled. (Doc. 104-3, p. 18).  Accordingly, Glasslam discussed with Budnick about finding a solution.

---

[1]The acronym "SHIT" testing was brought up by a Glasslam employee.  Mr. Howes and other Glasslam employees found it be humorous, and it became a company shorthand.  (Doc. 97-1, p. 20).

Budnick contacted Tesa and discovered that Tesa made the 4965 with a white liner.  (Doc. 97-11, p. 18).  On September 25, 2007, Miaskiewicz spoke with Mr. Howes regarding his concerns about the liner, including his concerns about emissions of volatiles or out-gassing.  (Doc. 97-11, p. 43).  On September 26, 2007, Miaskiewicz sent Mr. Howes an email stating in relevant part:

> tesa 4965 concerns about emission of volatiles.  I am in touch with an Application Engineer and the VP of New Business Development at tesa regarding this subject.  They provided me with a NASA test report that shows tesa 4965 performance vs other tesa tapes.  I do not know if you will ever find a tape that has zero emissions.  The report details that the collected volatile condensable materials measured for tesa 4965 was 0.02%, far less than any of their other products, and I would guess at worst in line with any other product that we could identify as a competitive option.  The report is dated back to 1993 and I have asked tesa to provide a letter stating that the product does not emit volatiles and that the construction of tesa 4965 remains the same to this day as when this report was written.  In all my years at tesa I know the product has remained unchanged and I am confident that they will report the same.  I hope to have that letter Monday the latest.

(Doc. 97-12, p. 1).[2]  Attached to the email was an "analytical test report" dated October 25, 1993, which showed that the 4965 had a 0.02% collected volatile condensable materials ("CVCM"), which relates to the amount of outgassing.  (Doc. 97-12, p. 2).

On September 27, 2007, Miaskiewicz sent Mr. Howes an email stating that he would have a letter from Tesa no later than tomorrow.  He also noted that Tesa had asked him "to make sure the report [he] sent yesterday is not used for verification at

---

[2]Miaskiewicz had previously worked for Tesa for ten years prior to joining Budnick.  (Doc. 97-11, p. 8).

the customer as it is outdated.  They will explain the results in the letter." (Doc. 97-14).

On September 28, 2007, Miaskiewicz sent Mr. Howes an email attaching a letter from Tesa and stating:

> Please see the attached letter from tesa.  I hope this alleviates any concerns regarding the out gassing of volatiles.
>
> We received the 4965 with the PET liner today.  We will receive the other rolls soon enough.  The results of the 4965 were extremely promising.  We laminated the material to one of your gaskets and bent the extrusion to and beyond the 6" core size.  The liner performed as well as the blue in our eyes and far better than the red tesa PP liner.  Alex is working with production to spool the material that we have onto a core for you to run through the equipment.  We assume you will need 2 spools to run through the equipment.

(Doc. 97-14, p. 1).  The attached letter was from Tesa to Budnick and stated as follows:

> Pursuant to the question of outgassing and our tesa® 4965, please be advised that the test data on file with tesa tape inc. indicates a CVCM (Collected Volatile Condensable Materials) level of 0.02%. Tests were conducted in accordance with ASTM Standards E-595-77 and are derived in accordance with NASA Reference Publication 1124.
>
> The tesa® 4965 test results generated the lowest CVCM levels amongst other products tested, and according to our experience, no known reported issues involving the outgassing of tesa® 4965 exist.
>
> All information is provided in good faith, and as always, tesa recommends the user conducts additional testing to determine the suitability of the product under intended conditions.

(Doc. 97-14, p. 2).  On November 19, 2007, two spools of the 4965 PV2[3] or the white

---

[3]PV2 stands for product variation.  (Doc. 97-3, p. 17).

tape were sent to Glasslam as a sample.  (Exhibit 15).

On November 30, 2007, Budnick sent Mr. and Mrs. Howes an email attaching a new quote with a price increase for the spools because the liner of the 4965 had changed, along with a copy of Budnick's terms and conditions.  (Doc. 97-16).  The quote was for 289 spools of the white tape with each spool to contain 30,000 linear feet of tape at a price of $502.677 each.  Also, attached to the email was a "first article sample approval" form.  (Doc. 97-16).  That same day, Glasslam, via Mr. Howes, ordered 144 spools of the white tape.  (Doc. 104, Ex. 10).

On December 3, 2007, Mr. Howes signed the "first article sample approval" form that was sent to him along with the quote and Budnick's terms and conditions, indicating that the sample of the white tape shipped to him on November 30, 2007, tested on a trial run that met his requirements and was suitable for his application. (Doc. 97-21).  Mrs. Howes emailed Birch this form that same day, stating, "Please find this letter as confirmation that Steve has checked the samples of the new liner # 4965PV2 and it is acceptable.  Steve has also received the new quotation as per attached and acknowledged the price increase per spool."  Mr. Howes did not perform SHIT testing on the white tape to check for outgassing, but only tested the tape to see if it properly adhered to the rubber.  (Doc. 104-3, p. 32).  Glasslam and Budnick both believed that the 4965 and the 4965 PV2 were the same tape with the exception of a different liner.  (Doc. 97-4, p. 12, Doc. 97-11, p. 48).

On January 10, 2008, Budnick and Glasslam executed an inventory agreement, which authorized Budnick to stock up to 566 spools on the floor and have

566 spools in the pipeline of the white tape (Doc. 97-22). An inventory agreement was entered into so that there would be no gap in providing tape to Glasslam. (Doc. 97-4, p. 14). On January 30, 2008, Glasslam ordered 3400 spools of the white tape. (Doc. 91-3). The purchase order indicated that it was ordered by Mrs. Howes and approved by Mr. Howes. It is also indicated that it was a "blanket order" for "6 months supply." The order was placed by Mrs. Howes over an email sent to Birch and copying Mr. Howes (Doc. 110-1, p. 1).

Fenestration & Glass Services ("Fenestration") is partially owned by Mr. and Mrs. Howes and manufactures the Air-Tight for Glasslam. (Doc. 97-25, p. 2). Fenestration began manufacturing the Air-Tight in late December 2008, but production was stopped in approximately late March or early April 2009 after customers started reporting that the Air-Tight was failing their independent tests. (Doc. 97-25, p. 3). Accordingly, Fenestration began testing the 4965 PV2 or white tape in April 2009 and the 4965 or red tape in May 2009 (Doc. 97-25, p. 10). According to Glasslam, the 4965/red tape passed all tests but the 4965 PV2/white tape failed all tests. (Doc. 97-25, p. 10). The testing revealed that white tape was causing outgassing.[4] In April 2009, Glasslam informed Budnick that it did not want anymore tape and did not believe it was responsible for paying for the tape it had received. (Doc. 97-11, p. 41).

---

[4]The testing also revealed that the rubber spacer was also contributing to out-gassing. Glasslam learned that it was not drying the rubber spacer sufficiently and corrected their production of the rubber spacer. All components where then retested and only the white tape produced outgassing and staining of the e-glass.

On June 5, 2009, Budnick filed suit against Glasslam in Illinois state court. This case was removed here by Glasslam based upon diversity on August 21, 2009. (Doc. 2). In its complaint, Budnick alleged a breach of contract claim against Glasslam for not paying for tape products provided by Budnick and for refusing to accept delivery or to pay for other remaining product and amounts in violation of the agreement entered into by the parties. Budnick also alleged that pursuant to the contract, Glasslam owed Budnick reasonable attorneys' fees and interest. Shortly after removing to this Court, on August 25, 2009, Glasslam filed a counterclaim against Budnick, alleging three counts: 1) breach of contract; 2) breach of express warranty; and 3) breach of implied warranty. (Doc. 7). On February 19, 2010, Glasslam brought Tesa into the case by filing a third party complaint against Tesa, alleging four counts: 1) negligence; 2) breach of implied warranty; 3) breach of contract for the benefit of a third party; and 4) negligent misrepresentation. (Doc. 33).

On April 5, 2010, Tesa filed a motion to dismiss Glasslam's negligence and negligent misrepresentation counts (Doc. 48), and on September 20, 2010, the Court entered an order denying that motion. (Doc. 67). On March 15, 2011, Glasslam filed a motion for leave to file a first amended counterclaim against Budnick (Doc. 77) and a motion for leave to file first amended third party complaint against Tesa (Doc.78), seeking to add an alternative theory of recovery based upon fraudulent misrepresentation(s) made by Budnick and Tesa. Both Budnick and Tesa opposed the motions for leave to amend and on April 4, 2011, Magistrate Judge Phillip M.

Frazier denied Glasslam's request to amend its counts against Budnick and Tesa. (Doc. 87). Glasslam has appealed that decision (Doc. 88), and for the reasons stated below, the Court denies that appeal.

On June 23, 2011, several motions for summary judgment were filed. Budnick filed a motion for summary judgment as to its claim for breach of contract claim against Glasslam (Doc. 91) and a motion for summary judgment as to Glasslam's counter-claims against Budnick (Doc. 96). Tesa filed a motion for partial summary judgment on counts one (negligence) and four (negligent representation) of Glasslam's complaint (Doc. 94) and a motion for partial summary judgment on counts two (breach of implied warranty) and three (breach of contract for the benefit of a third party) of Glasslam's complaint (Doc. 98). Glasslam filed oppositions to all of the motions and replies were filed by Budnick and Tesa. For the reasons that follow, Glasslam's motions for summary judgment are granted as are Tesa's.

## II.  Standard of Review

In a diversity case, the Court applies state law to substantive issues. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). Federal law governs procedure. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010). When neither party raises a conflict of law issue in a diversity case the applicable law is that of the state in which the federal court sits. *Id.* Thus, in this case, Illinois law applies. Under Illinois choice of law rules, however, litigants can stipulate to which substantive law applies to their case so long as the stipulation is reasonable. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1219 n. 6 (7th Cir. 1995). To the extent that the

Illinois Supreme Court has not yet spoken to any of the issues before the Court, the Court shall apply the law as it would predict the Illinois Supreme Court would if deciding the case. *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001).

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994).  The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.  Analysis

### A.  Glasslam's Appeal of Magistrate Judge Decision

As mentioned above, Glasslam appeals the magistrate judge's denial of its motion for leave to amend its counterclaim against Budnick and its third party

complaint against Tesa.  In its motion for leave to amend, Glasslam sought to add a claim of fraudulent misrepresentation against Budnick and Tesa.  In its appeal, Glasslam' sets forth in its argument that the magistrate followed an incorrect legal standard in denying its appeal.  Specifically, Glasslam suggests that "delay in seeking leave to amend, standing alone, is insufficient to justify denial."  Glasslam argues that the Seventh Circuit's decision in *Dubicz v. Commonwealth*, 377 F.3d 787, 792 (7th Cir. 2004), held that delay in seeking leave to amend is insufficient to justify denial and must be held with some other reason, typically prejudice to the non-moving party.  Glasslam contends that neither Budnick nor Tesa argued that Glasslam's delay caused them any prejudice and that the magistrate judge failed to determine that Glasslam's delay would result in any prejudice.  Thus, Glasslam derives that the order denying leave to amend is contrary to law.

The Court may modify or reverse a decision of a magistrate judge on a nondispositive issue upon a showing that the magistrate judge's decision is "clearly erroneous or contrary to law."  FED. R. CIV. P. 71.1(a); SDIL-LR 73.1(a).   A finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364 395 (1948)); see also *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997) ("The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made.").  "When there are two

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)).

Rule 15 of the Federal Rules of Civil Procedure provides that when a party requests to amend its pleadings, a court "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Nevertheless, "[i]t is well within the province of the district court to deny leave to amend if, among other things, there is undue delay or undue prejudice would result to the opposing party if the amendment were allowed." *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 759 (7th Cir. 2002). "[District] courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Johnson v. Cypress Hill*, 641 F.3d 867, 871-72 (7th Cir. 2011) (quoting *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009)). "And while delay on its own is usually not reason enough for a court to deny a motion to amend, [*Dubicz*, 377 F.3d at 792-93], the 'longer the delay, the greater the presumption against granting leave to amend.'" *Johnson*, 641 F.3d at 872 (quoting *King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994)).

Here, the magistrate judge's decision to deny leave to amend was not clearly erroneous or contrary to law. While Glasslam is correct that delay on its own is not usually enough reason to deny a motion to amend, the magistrate judge did not base its decision solely on delay, but also based it on prejudice to Budnick and Tesa, stating, "[a]llowing [Glasslam] to add a new theory of liability at this stage would

deprive Budnick and Tesa Tape of a fair opportunity to gather and exchange relevant information, file motions, and prepare for trial."  Contrary to Glasslam's assertions, both Tesa and Budnick argued that they would be prejudiced if leave were granted (Doc., 83, p. 4, 84, p. 2-3), and it was not error for the magistrate to conclude that prejudice would result by changing the focus of and requiring more discovery.  See *Johnson*, 641 F.3d at 872-73 ("Allowing Johnson to amend his complaint would mean additional discovery focused on whether misappropriation had occurred under Illinois state law. [Citation].  Thus, in addition to a lengthy delay, allowing Johnson to change the course of the litigation fours years into the case would be prejudicial to Cypris Hill.").  Furthermore, the delay here was extreme and Glasslam has "not argued that its delay in seeking to leave to amend was not an undue delay," (Doc. 88, p. 12), leading to a greater presumption that the motion should be denied.  See *Johnson*, 641 F.3d at 872; *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008).  Moreover, granting Glasslam leave to amend to add fraudulent misrepresentation claims against Budnick and Tesa would be futile as there is absolutely no evidence in the record to support those claims.  Thus, Glasslam's appeal of magistrate judge decision (Doc. 88) is denied.

**B.  Budnick's Motion for Summary Judgment Against Glasslam's Claims**

In its motion for summary judgment against Glasslam's claims, Budnick contends that Budnick's terms and conditions control the relationship between Budnick and Glasslam as it relates to this matter, and that Glasslam's claims are barred by those terms and conditions.  Further, Budnick argues that Glasslam's

claims are defeated by the Illinois Uniform Commercial Code ("UCC"), 810 ILCS 5/2-101, *et seq.*, because Glasslam has failed to prove the existence of an oral agreement and because Budnick did not expressly warrant the product at issue; rather, the only warranty relevant to this matter is the limited warranty set forth in the terms and conditions but Glasslam has not brought a cause of action against Budnick based upon the terms of the express limited warranty set forth in the terms and conditions. Moreover, Budnick asserts that it did not impliedly warrant that the product would be fit for a particular purpose, and Glasslam has failed to prove the existence of such warranty.  In fact, Budnick posits that Glasslam has waived any reliance upon the implied warranty of fitness for a particular purpose under § 316(3)(b) of the Illinois UCC.

Glasslam responds by contending that summary judgment should not be entered in Budnick's favor because a genuine issue of material fact exists as to whether an oral agreement was reached between Mr. Howes and Miaskiewicz, because Budnick's merger clause is unenforceable, because Budnick breached its express warranty, and because Budnick created implied warranties.

Glasslam does not dispute that Budnick's terms and conditions apply to the case at hand; nor does Glasslam dispute that the Illinois UCC applies.  Accordingly, the Court finds that the Illinois Uniform Commercial Code–Sales ("UCC") applies because this case revolves around contracts for the sale of goods.  See 810 ILCS 5/2-101 *et seq.*; *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 661 n. 3 (Ill. App. Ct. 2007); *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*,

338 Ill. App. 3d 1010, 1017 (Ill. App. Ct. 2003).  Further, the Court also notes that Budnick's terms and conditions state that Illinois law applies.  Therefore, the Court will apply the Illinois UCC to the issues presented to the Court.  The Court will not address arguments not made to the Court nor construct arguments for the parties.  See *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720-21 (7th Cir. 2008) ("A plaintiff cannot rely on the entire UCC and leave it to the court to determine what code sections apply to her claim.  It is not the court's responsibility to research the law and construct the parties' arguments for them.").

"'When commercial parties of equal bargaining power allocate the risk of loss by contract, . . . there is a strong public policy to give effect to the private allocation.  Under the U.C.C., commercial parties can allocate the risk of loss from defects through warranties, disclaimers and limitations on warranties.'"  *Collins Co. v. Carboline Co.*, 532 N.E.2d 834, 838 (Ill. 1988) (quoting *Henry Heide, Inc. v. WRH Prods. Co.*, 766 F.3d 105, 109 (3rd Cir. 1985)).

   *1. Breach of Oral Contract*

In count one of Glasslam's counterlclaim, Glasslam alleges a claim of breach of oral contract.  Budnick contends that summary judgment should be entered in its favor because there is no evidence of any oral agreement, and because Budnick's terms and conditions contain a merger clause which forecloses Glasslam's claim.  Glasslam suggests, however, that summary judgment cannot be entered on this issue because a genuine issue of material exists as to whether an oral agreement was reached between Mr. Howes and Miaskiewicz.  As support, Glasslam cites to

*Commonwealth E. Mortg. Co. v. Williams*, 163 Ill. App. 3d 103, 111 (Ill. App. Ct. 1987).  Furthermore, it is Glasslam's position that summary judgment cannot be entered because the merger clause is unenforceable as a matter of law.  Glasslam indicates that the merger clause is unenforceable because the merger clause is part of a "boilerplate" agreement and because the bargaining power between the powers greatly favored Budnick.  In addition, Glasslam suggests that the merger clause is unenforceable because the contract between Glasslam and Budnick was procured by fraud.

The first issue that the Court must address is whether the agreement between the parties is integrated.  "The determination of whether a contract is completely integrated is a question of law."  *Hessler*, 338 Ill. App. 3d at 1019.  "A contract is integrated when the parties intend it to be a final and complete expression of the agreement between them."  *Midwest Builder Distrib., Inc.*, 383 Ill. App. 3d at 661 (citing *Koester v. Weber, Cohn & Riley, Inc.*, 193 Ill. App. 3d 1045, 1048 (Ill. App. Ct. 1989)).  "The effect of integration is to 'preclude[] evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms."  *Midwest Builder Distrib., Inc.*, 383 Ill. App. 3d at 661 (citing *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill.2d 265, 269 (1994)).

Section 2-202 of the UCC, entitled "Final written expression: parol or extrinsic evidence" provides as follows:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in writing intended by the parties as a final expression of their agreement with respect to

> such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of performance, course of dealing, or usage of trade (Section 1-303); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement.

810 ILCS 5/2-202. "Thus, under the UCC's parol evidence rule, evidence of prior agreements or contemporaneous oral agreements is generally inadmissible to vary or contradict the terms of an integrated written contract." *Hessler*, 338 Ill. App. 3d at 1019. "In this inquiry, the focus is on the intent of the parties, and the factors to be considered include: merger or integration clauses, disclaimer clauses, prior negotiations, any alleged extrinsic terms, and the sophistication of the parties." *Id.* at 1020 (citing *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1132-33 (7th Cir. 1994)). A merger or integration clause "is strong evidence of the parties' intent, not only to be bound by the agreement, but to have it override conflicting provisions that may have been contained in previous or contemporaneous dealings between the parties." *Midwest Builder Distrib., Inc.*, 383 Ill. App. 3d at 662. "When such a clause is present, Illinois courts will accept it at face value as an expression of the parties' will that the written contract be the final deal." *Id.*

Here, it is undisputed that Budnick's terms and conditions, which was a part of the agreement between the parties, contained the following merger or integration clause:

9. **Exclusive Terms and Conditions.**  THE PROVISIONS OF THIS AGREEMENT ARE SOLELY FOR THE BENEFIT OF BUDNICK CONVERTING, INC. AND BUYER AND CONNOT [sic] BE CHANGED MODIFIED OR AMENDED EXCEPT BY WRITTEN AGREEMENT OF THE PARTIES.  THIS AGREEMENT AND THE DOCUMENTS REFERRED TO HEREIN CONTAIN THE ENTIRE AND ONLY AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SALE OF THE PRODUCTS COVERED HEREBY AND ANY RELATED SERVICES, WARRANTIES AND OBLIGATIONS OF BUDNICK CONVERTING, INC. AND SUPERSEDES ANY ALLEGED TERM, REPRESENTATION, PROMISE OR CONDITION NOT SPECIFICALLY INCORPORATED HEREIN.

Despite this clause, Glasslam argues that summary judgment cannot be entered because a genuine issue of material fact exists as to whether an oral agreement exists between Budnick and Glasslam where Budnick orally agreed that it would supply tape that would not "leech uncured modifiers, or solvents, upon exposure to heat or ultraviolet light normally associated with insulated glass products."  The Court disagrees.

Here, the factors to be considered in determining whether the agreement is integrated weigh in favor of Budnick.  First, Budnick's terms and conditions contains a merger clause that says "THIS AGREEMENT AND THE DOCUMENTS REFERRED TO HERE IN CONTAIN THE ENTIRE AND ONLY AGREEMENT BETWEEN THE PARTIES . . . AND SUPERSEDES ANY ALLEGED TERM, REPRESENTATION, PROMISE OR CONDITION NOT SPECIFICALLY INCORPORATED HEREIN."  Second, Glasslam's alleged oral contract would directly contradict the limited warranty provision contained in the agreement.  Third, prior negotiations between the parties and the sophistication of the parties both weigh in favor of a finding that the

agreement was integrated as the parties had numerous prior business dealings and, as Mr. Howes noted, everyone in the industry has its own terms and conditions. Moreover, the fact that the merger clause was preprinted and part of a "boilerplate" agreement, without more, does not render it unenforceable.  See *Hessler*, 338 Ill. App. 3d at 1020 ("Moreover, the fact that the integration clause is preprinted and was not specifically negotiated, without more, does not automatically render it inoperative.") Further, Glasslam's argument that Budnick had superior bargaining power is also belied by the record.  Indeed, the record establishes that Glasslam was fully aware of Budnick's terms and conditions and knew that they were considered part of the agreement.  Furthermore, there is also no evidence of fraud by Budnick in the record.  Lastly, Glasslam's reliance on *Williams* is misplaced.  The case here is clearly distinguisable from *Williams* and Glasslam has failed to explain how *Williams* is relevant to this case.  Accordingly, Budnick's motion for summary judgment as to Glasslam's claim for breach of an oral contract is granted.

   2. *Breach of Express Warranty*

   In count two of the counterclaim, Glasslam alleges breach of an express warranty, contending that "although [Budnick] did not provide a written warranty, [Budnick] expressly warranted to [Glasslam] that the adhesive acrylic tape would meet the requirements and specifications of [Glasslam] to produce a rubber spacer to be used in the manufacture of insulated glass units."  Budnick contends that the terms and conditions exclude the alleged express warranty.  Glasslam does not address this argument, but rather contends that it has stated a valid claim for breach

of the express limited warranty, that a genuine issue of material fact remains regarding the scope of Budnick's express limited warranty, and that Budnick's representations created additional express warranties.

As mentioned above, Budnick's terms and conditions contains a warranty provision, which provides as follows:

> 5. **Limited Warranty, Inspection and Claims.**  Budnick Converting, Inc. warrants exclusively to Buyer that each Product sold hereunder will be free from defects in material and workmanship for 6 months from the date of shipment subject to all other terms and conditions set forth below.  Budnick Converting, Inc. will have the right at its expense to inspect and have returned any Product claimed by Buyer to violate this "Limited Warranty".  Budnick Converting, Inc.'s sole obligation and Buyer's exclusive remedy for any breach of the Limited Warranty will be the repair or replacement, at Budnick Converting, Inc.'s option, of the defective Product.  Any replacement or repaired Product will be covered by the Limited Warranty only for the remainder of the original warranty period. If Budnick Converting, Inc. determines that such repair or replacement is not economical or feasible or such remedy fails of its essential purpose, Buyer's exclusive alternate remedy and Budnick Converting, Inc.'s sole obligation for any such breach will be the return to Buyer of the purchase price paid to Budnick Converting, Inc. for the Product in which case Budnick Converting, Inc., may repossess the Product. Budnick Converting, Inc. will not be liable for damages in excess of the purchase price of the products/services or for incidental or consequential damages.  The Limited Warranty will apply only if the delivered Product is not altered or damaged and is properly installed, stored, handled, maintained and used in accordance with the Product's normal usage and manufacturer's or any Budnick Converting, Inc. published instructions and Buyer notifies Budnick Converting, Inc. of the defect in writing not more than one year after its delivery to Buyer and not more than 30 days after Buyer first learns of the defect.  Buyer will promptly inspect all Products delivered to it.  Any claim against Budnick Conversting, Inc. under the Limited Warranty or otherwise for shortages or for damages to or defects in the delivered Products that are observable in a reasonable visual inspection will be deemed waived unless the claim is made in writing to Budnick Converting, Inc. within 30 days after such

delivery.  EXCEPT FOR THIS EXPRESS LIMITED WARRANTY, BUDNICK CONVERTING, INC. MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, REGARDING THE PRODUCTS COVERED HEREBY INCLUDING (WITHOUT LIMITATION) ANY IMPLIED WARRANTIES OR MERCHANTABILITY FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGNEMENT [sic].  NO EMPLOYEE, AGENT, OR REPRESENTATIVE OF BUDNICK CONVERTING, INC. IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY ON BEHALF OF BUDNICK CONVERTING, INC. EXCEPT TO THE EXTENT SPECIFICALLY STATED HEREIN.  ALL WRITTEN NOTICES PERTAINING TO THE LIMITED WARRANTY INSPECTION AND CLAIMS HEREUNDER SHALL BE SENT BY CERTIFIED MAIL TO BUDNICK CONVERTING, INC. 200 ADMIRAL WEINEL BLVD., P.O. BOX 197, COLUMBIA, ILLINOIS 62236.

Here again, the parol evidence rule precludes the Court from finding any express warranty outside the written agreement of the parties.  The limited warranty provision contained in the agreement between the parties would be directly contradicted by the express warranty claimed by Glasslam and is precluded by the parties' agreement.  In fact, the agreement provides in capital letters that "EXCEPT FOR THIS EXPRESS LIMITED WARRANTY, BUDNICK . . . MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, REGARDING THE PRODUCTS COVERED HEREBY INCLUDING (WITHOUT LIMITATION) ANY IMPLIED WARRANTIES OF MERCHANTABILITY FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGNEMENT [sic]."  With regard to Glasslam's argument that a question of fact exists as to whether Budnick's representations created additional express warranties, the agreement provides that "NO EMPLOYEE . . . OF BUDNICK . . . IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY ON BEHALF OF BUDNICK . . . EXCEPT

TO THE EXTENT SPECIFICALLY STATED HEREIN."  The record clearly establishes that no other warranties were made in this case by Budnick and that Glasslam was responsible for ensuring that the tape conformed with its intended use.  Thus, there is no genuine issue of material fact as to Glasslam's breach of express warranty claim and Budnick is entitled to judgment as a matter of law.

### 3. *Implied Warranty of Fitness for a Particular Purpose*

In count three of the counterclaim Glasslam alleges that "Budnick impliedly warranted to [Glasslam] that the adhesive acrylic tape would be fit for their use in the production of a rubber spacer to be used in the manufacture of insulated glass units." Budnick posits that the terms and conditions contain a limited warranty and specifically exclude all other warranties, including but not limited to the implied warranty of fitness for a particular purpose.  Glasslam counters that this Court should not enforce Budnick's disclaimer against Glasslam because Budnick's disclaimer was not conspicuous and because enforcing a disclaimer appearing in a contract in which Glasslam took no part in negotiating would be unreasonable if enforced.

Like Glasslam's other two claims, this claim is also foreclosed by the agreement entered into between the parties. As mentioned previously, that agreement provides that  "EXCEPT FOR THIS EXPRESS LIMITED WARRANTY, BUDNICK . . . MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, REGARDING THE PRODUCTS COVERED HEREBY INCLUDING (WITHOUT LIMITATION) ANY

IMPLIED WARRANTIES OF MERCHANTABILITY FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGNEMENT [sic]."  The record also belies Glasslam's assertions that the disclaimer was not conspicuous.  Indeed, the disclaimer was in all capital letters and Glasslam was aware that it was intended to be part of the agreement.  Moreover, the fact that Glasslam took no part in negotiating this provision does not make it unreasonable to be enforced without something more. See *Hessler*, 338 Ill. App. 3d at 1020 ("Moreover, the fact that the integration clause is preprinted and was not specifically negotiated, without more, does not automatically render it inoperative.")  Therefore, Budnick is entitled to judgment as a matter of law on this claim as well.

For the reasons stated above, Budnick's motion for summary judgment as to Glasslam's counter-claims against it is granted.

## C.  *Budnick's Motion for Summary Judgment Against Glasslam*

Budnick filed its motion for summary judgment contending that its terms and conditions applied to its breach of contract claim and that summary judgment should be entered in its favor as a matter of law.  Budnick notes that Glasslam raised no affirmative defenses to the complaint, and has not objected to or contested any of the terms and conditions.[5]

In its response in opposition, Glasslam contends that Budnick has failed to

---

[5]But see FED. R. CIV. P. 8(c)(2) ("If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and my impose terms for doing so.").

establish that it is entitled to judgment as a matter of law, because it has failed to establish by undisputed facts the essential terms of its contract with Glasslam, regardless of the agreed upon terms.  Specifically, Glasslam argues that a genuine issue of material fact regarding the quantity of the white tape that Glasslam ordered precludes entry of summary judgment on Budnick's complaint, and that a genuine issue of material fact exists as to whether Budnick fully performed on its contract with Glasslam.  The Court will address these issues in turn.

### 1. *Quantity*

First, Glasslam disputes that it ever ordered 3,400 spools of the white tape because Mr. Howes never signed a purchase order for that quantity and because he allegedly objected to that quantity being shipped.  This argument is a non-starter.  The record clearly establishes that Glasslam ordered 3,400 spools of tape on January 30, 2008.  While Mr. Howes claims that he did not authorize this order (Doc. 97-2, p. 11), Mrs. Howes, who was in charge of purchasing, says he did, and in any event, there is no material question of fact that Mrs. Howes had the authority to make this purchase on behalf of Glasslam and did in fact do so.  The fact that Mr. Howes did not sign the purchase order is irrelevant.  In fact, Birch testified that he dealt with Mrs. Howes on every single purchase order.  (Doc. 97-4, p. 27).  Moreover, his claims that he objected to the order find no support in the record.  Thus, this argument is without merit.

### 2. *Budnick's Performance*

Next, Glasslam contends that because Budnick provided less than 30,000

linear feet of tape on each spool of the white-liner 4965 tape that Glasslam never ordered summary judgment should not be entered.  This argument is also baseless.  First, Budnick's terms and conditions provide that "[s]hipped quantities may vary +/- 10% from purchase order quantity and will be considered complete."  Second, Glasslam has failed to set forth specific facts showing that there is a genuine issue of fact for trial.  In support of its claim, Glasslam cites to an email that indicates that in February 2011 Glasslam measured a reel of tape that was supposed to be 30,000 linear feet, but it was actually only 28,246 feet, and to Mr. Howes' deposition testimony that the rolls averaged 28,000 feet.  (Doc. 104-14, 104-16, p. 8).  Even if these allegations are true, the spools would still be within "+/- 10% from the purchase order quantity", i.e., between 27,000 and 33,000 feet, and would be within the terms of the agreement between the parties.  Accordingly, this does not create a genuine issue of material fact as to whether Glasslam breached its contract with Budnick.

In sum, Budnick has established the absence of a genuine issue of material fact as to its breach of contract claim, and as to Glasslam's counter-claims.  Accordingly, Budnick's motions for summary judgment are granted.  Issues still remain, however, as to the amount of damages to which Budnick is entitled.  In its motion for summary judgment, Budnick claims that it is entitled to damages in the amount of $2,473,353.00 but Glasslam did not address damages in its response.  Therefore, the Court orders Glasslam to file a supplemental brief addressing the amount of damages to which Budnick is entitled within fourteen days of the date of this order.  Budnick shall have seven days from the date Glasslam's brief is filed to respond thereto.

**D.  Tesa's Motions for Summary Judgment**

Tesa moves for summary judgment on Glasslam's counts one and four (negligence and negligent misrepresentation) on the grounds that those claims are barred by the economic loss doctrine established by *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 450 (Ill. 1982).  Tesa moves for summary judgment on counts two and three of Glasslam's complaint on the grounds that Tesa disclaimed all implied warranties in connection with the adhesive acrylic tape at issue.  The Court will address each argument in turn.

1.  *The Moorman Doctrine*

Tesa contends that the evidence adduced during discovery establishes that Glasslam's tort claims are barred by the economic loss doctrine because such claimed damages constitute nothing beyond commercial disappointment.  Tesa maintains that the damages set forth in the report and summary prepared by Glasslam's outside accountant, Salvatore D. Cuccia, confirms that Glasslam's claimed damages are barred under *Moorman*.  Glasslam contends that the *Moorman* doctrine does not apply because Glasslam is not seeking to recover "purely economic" damages.  Glasslam argues, without citing to any case law for support, that it "is seeking to recover monies it otherwise would not have expended had Tesa not offered false assurances regarding its product, not pecuniary losses it suffered from its frustrated commercial expectations."  Contrary to Tesa's position, Glassman believes Cuccia's report confirms that Glasslam is not seeking recovery for purely economic

losses.  Alternatively, Glasslam argues that even if all it seeks to recover are purely economic losses, two exceptions to the *Moorman* doctrine apply, precluding summary judgment.  First, Glasslam contends that the false representation exception applies.  Second, Glasslam asserts that the negligent misrepresentation exception applies.

Under Illinois's economic loss doctrine, a plaintiff cannot recover in tort for purely economic loss.  *Moorman,* 435 N.E.2d at 450.  In *Moorman,* the Illinois Supreme Court defined "economic loss" to mean "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits without any claim of personal injury or damage to other property."  *Id*. at 449. Further, the Court stated recovery in tort requires a showing of harm above and beyond disappointed expectations through personal injury or property damage.  *Id*. at 451.  The Court in *Moorman* concluded the proper remedy for economic losses lies in contract law and the Uniform Commercial Code.  *Id*.  By allowing parties to a commercial transaction to recover for economic losses under tort remedies, the Court would effectively render contract law and the Uniform Commercial Code provisions meaningless.  *Id.*  "Illinois recognizes three exceptions to *Moorman's* economic loss rule: (1) where the plaintiff sustains damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the

guidance of others in their business transactions." *Trans State Airlines v. Pratt & Whitney Canada, Inc.*, 177 Ill.2d 21, 26-27 (Ill. 1997) (emphasis removed).[6]

### a. Glasslam's Alleged Damages

"[T]o recover in negligence there must be a showing of harm above and beyond disappointed expectations." *In re Chi. Flood Litig.*, 176 Ill. 2d 179, 201 (Ill. 1997) (quoting *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 177-78 (Ill. 1982)). "For example, in *Redarowicz*, the court held that plaintiff's property damage was caused by a construction defect, which was a disappointed commercial expectation." *In re Chi. Flood Litig.*, 176 Ill. 2d at 201.

Glasslam alleged in its complaint that the damages sought are not solely economic losses but, additionally, for damage to "other property," i.e., the damages arise from the harm to the windows Glasslam's customers purchased, not to the rubber spacers themselves. Because of these allegations, the Court found that the economic loss doctrine did not bar Glasslam's tort claims at the pleading stage. Now that discovery has concluded, however, there is no genuine issue of material fact that the only damage Glasslam alleges are economic loss and are therefore Glasslam's tort claims are barred by *Moorman* unless an exception applies.

In Cuccia's summary of actual costs incurred, Cuccia sets forth damages for the cost of the materials, manufacturing, Glasslam's employees, sales and marketing,

---

[6]Glasslam does not allege that the personal injury or property damage resulting from a sudden or dangerous occurrence exception applies. Thus, that exception will not be addressed by the Court.

advertising, and trade shows associated with the "Air-Tight."   (Doc. 95-6, p. 3).

Glasslam has not produced any evidence to support its allegation that it incurred

damages from the harm to the windows Glasslam's customers purchased.   Rather,

Cuccia's report conclusively establishes that Glasslam's alleged damages consist

entirely of disappointed contractual expectations.   See *Westfield Ins. Co. v. Birkey's

Farm Store, Inc.*, 399 Ill. App. 3d 219, 233 (Ill. App. Ct. 2010) ("allegations of loss

of employee time and productivity losses are solely economic losses to which the

economic loss doctrine clearly applies.").   Glasslam has not cited to any case law to

support its position and has not developed its argument enough to warrant any

further discussion.   Thus, Glasslam's tort claims are barred by the economic loss

doctrine absent a valid exception to that doctrine.

### b. False Representation

Glasslam contends that while economic loss is not recoverable where a

manufacturer makes an innocent misrepresentation, the Illinois Supreme Court held

in   *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599 (Ill. 1980), that economic loss is

recoverable in tort where one intentionally makes false representations.   Glasslam

contends that Tesa fraudulently misrepresented that the 4965 showed a collective

volatile condensable materials (CVCM) level of .02% when later testing revealed that

the actual CVCM level of the white tape was .50%.   Tesa argues that this exception

does not apply because Glasslam does not allege that its damages were proximately

caused by any fraudulent or intentional misrepresentations made by Tesa and

because no evidence exists that could support an allegation of fraud.   The Court

agrees with Tesa.

The elements of a claim of fraudulent misrepresentation in Illinois are a 1) false statement of material fact 2) known to be believed or to be false by the party making it; 3) intent to induce the other party to act; 4) action by the other party in reliance on the truth of the statement; and 5) damage to the other party resulting from that reliance. *Dloogatch v. Brincat*, 920 N.E.2d 1161, 1166 (Ill. App. Ct. 2009). Under the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff "alleging fraud . . . must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). Here, Glasslam did not allege fraud in its complaint against Tesa and as set forth for the reasons above, this Court did not allow it to amend its pleadings to do so. Nevertheless, even in its brief in opposition to Tesa's motion for summary judgment, Glasslam does not allege the requisite intent necessary to establish a claim of fraud. The Court infers that the reason Glasslam did not do this is because the record is wholly devoid of such evidence. In fact, Glasslam's fraud assertion is based on the letter that Tesa sent Budnick regarding a test of the 4965 or red tape that took place in 1993. Tesa's letter, however, also stated that "[T]esa recommends the user conducts additional testing to determine the suitability of the product under intended conditions." Further, Budnick informed Glasslam that the test data provided by Tesa was "outdated" and was "not to be used for verification" by the customer. Accordingly, there are no material questions of fact regarding whether fraud exists in this case and this exception does not apply.

### c. Negligent Misrepresentation

Glasslam contends that economic loss is recoverable in tort where one makes negligent misrepresentations, citing to *Rozny v. Marnul*, 250 N.E.2d 656, 663 (Ill. 1969). Tesa contends that this exception does not apply because Tesa was not in the business of supplying information for the guidance of others in their business transactions. Glasslam contends that although *Rozny* involved a land surveyor who provided negligent information to a third party, the Supreme Court did not declare that the exception to *Moorman* should be so narrowly construed.

To state a claim based on the negligent misrepresentation exception to *Moorman*, the plaintiff must demonstrate that: (1) the defendant is in the business of supplying information for the guidance of others in their business dealings; (2) the defendant provided information that constitutes a misrepresentation ; and (3) the defendant supplied the information for guidance in the plaintiff's business dealings. *Tyler v. Gibbons*, 368 Ill. App. 3d 126, 129 (Ill. App. Ct. 2006); *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 311 (Ill. App. Ct. 2002). "An allegation that the defendant is in the business of supplying information for the guidance of others is a legal conclusion that must be supported with well-pleaded factual allegations." *Tyler*, 368 Ill. App. 3d at 129 (citing *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18 (1999)). "The Illinois Supreme Court's test for determining whether a defendant is in the business of supplying information for the guidance of others in their business transactions is whether the end product of the relationship between plaintiff is a tangible object (i.e., a product) which could be readily described in a

Page 32 of 45

contract or whether it is intangile." *Prime Leasing, Inc.*, 332 Ill. App. 3d at 312 (internal citations omitted). "In short, if the intended end result of the plaintiff-defendant relationship is for the defendant to create a product, a tangible thing, then the defendant will not fit into the 'business of supplying information' negligent misrepresentation exception.' [Citation.]" *Id.* (quoting *Tolan*, 308 Ill. App. 3d at 28).

Here, Tesa obviously is not in the business of supplying information for the guidance of others in their business dealings and therefore this action is barred by the *Moorman* doctrine. As Glasslam alleged, Tesa "is a manufacturer and supplier of insulated glass products used by insulated glass and window manufactures to make a variety of decorative, safety and hurricane resistant insulated glass products." Simply because Tesa provided information about one of its products, does not transform Tesa it into the business of supplying information for the guidance of others in their business dealings. See *Tolan*, 308 Ill. App. 3d at 28 ("While the entity may exchange information, the information relates only to the goods or services and, thus, is 'supplied incidental to the sale of the product.'"). Thus, this exception to the *Moorman* doctrine does not apply.

In sum, Glasslam's negligence and negligent misrepresentation claims are barred by *Moorman* or the economic loss doctrine. Accordingly, Tesa's motion for partial summary judgment as to counts one and four is granted (Doc. 94).

### 2. Breach of Implied Warranty

In count two, Glasslam contends that Tesa knew that adhesive acrylic tape was to be used in the production of a rubber spacer to be used in the manufacturer of

insulated glass units; that Tesa manufactured the adhesive acrylic tape which Glasslam purchased, and Tesa impliedly warranted to Glasslam that the adhesive acrylic tape would be fit for its use in the production of a rubber spacer to be used in the manufacture of insulated glass units; that Tesa breached its implied warranty of fitness by failing to manufacture and provide adhesive acrylic tape that was fit for its use in the production and manufacture of a rubber spacer to be used in the manufacture of insulated glass units; and that as a direct and proximate result, Glasslam was damaged thereby.

Tesa claims that Glasslam's purported implied warranty claim fails as a matter of law because Glasslam contracted to purchase the tape from Budnick, not Tesa, and therefore lacks contractual privity with Tesa. Alternatively, Tesa argues that even if privity of contract exists between Glasslam and Tesa, Glasslam's breach of warranty claims have been disclaimed as a matter of law pursuant to 810 ILCS § 5/2-315. And if Glasslam is not bound by Tesa's warranty disclaimer, Tesa posits that Glasslam's implied warranty claims should still be dismissed because Glasslam had an opportunity to test and examine the tape to ensure fitness for a particular purpose before it purchased the tape from Budnick and therefore Glasslam's claims are barred under 810 ILCS 5/2-316(3)(b).

Glasslam contends that it is in vertical privity with Tesa. As to Tesa's argument that Glasslam's claims are barred by its warranty, Glasslam argues that Tesa's disclaimer is unenforceable as a matter of law because Tesa's disclaimer was not conspicuous and because enforcing a disclaimer appearing in a contract that Tesa

negotiated and executed with Budnick, but not Glasslam, would be unreasonable if enforced against Glasslam.

### a. Privity

Tesa contends that because Glasslam contracted to purchase the tape from Budnick, not Tesa, Glasslam lacks contractual privity with Tesa.  Glasslam cites to *Szanjna v. Gen. Motors Corp.*, 503 N.E.2d 760, 765 (Ill. 1986), for the proposition that it is in vertical privity with Tesa because it was in the distributive chain with Tesa.

"An implied warranty is derived from the interplay of a transaction's factual circumstances with the foreseeable expectations of a buyer or other person who is protected by law in those expectations."  *Collins Co.*, 532 N.E.2d at 838.  "The implied warranty arises regardless of an affected seller's actual wishes."  *Id.*

"Privity of contract or estate has been defined as 'mutual or successive relationship to the same rights of property.'" *Collins Co.*, 532 N.E.2d at 839 (quoting *Moore v. Shook*, 276 Ill. 47, 56 (Ill. 1916)).  "The relationship may be by operation of law, by descent, or by voluntary or involuntary transfer."  *Collins Co.*, 532 N.E.2d at 839.  "Privity of contract is '[t]hat connection or relationship which exists between two or more contracting parties.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1079 (5th ed. 1979)).

"In order for a plaintiff to file a claim for economic damages under the [UCC] for the breach of an implied warranty, he or she must be in vertical privity of contract with the seller."  *Jensen v. Bayer AG*, 371 Ill. App. 3d 682, 690-91 (Ill. App. Ct.

2007) (citing *Rothe v. Maloney Cadillac, Inc.*, 119 Ill. 2d 288, 292 (Ill. 1988)).

In *Szajna*, the Illinois Supreme Court declined to abolish the privity requirement in implied-warranty economic-loss cases. *Szajna*, 115 Ill. 2d at 311. In the opinion, the Court recognized that two kinds of privity exist: horizontal privity and vertical privity. *Id.* at 307. "Horizontal privity is not, in reality, a state of privity but rather one of nonprivity." *Id.* "The term refers to those who are not in the distributive chain of a product but who, nonetheless, use the product and retain a relationship with the purchaser, such as a member of the purchaser's family." *Id.* "Vertical privity refers to the relationship between those who are in the distributive chain." *Id.* The Court noted that the UCC does not directly address vertical privity. *Id.*

Glasslam contends that because it is in the distributive chain, it is therefore in vertical privity with Tesa and can bring its claim for breach of implied warranty. While this argument is appealing on its face, Glasslam has not cited and the Court has not found any cases where a third-party like Glasslam has been found to have vertical privity with the manufacturer like Tesa and can therefore sue for breach of implied warranty. Indeed, all the case law the Court has found, limits such claims to the "immediate" seller. See *Rothe*, 119 Ill. 2d at 292 (noting that in *Szajna*, "[w]e concluded that with respect to purely economic loss, the UCC article II implied warranties give a buyer of goods a potential cause of action only against his immediate seller."); *Shoop v. DaimlerChrysler Corp.*, 371 Ill. App.3d 1058, 1066 (Ill. App. Ct. 2007) ("Although the UCC extends a buyer's potential cause of action for

breach of the implied warranty of merchantability only to an immediate seller . . . .");
*Jensen v. Bayer AG*, 371 Ill. App. 3d 682, 691 (Ill. App. Ct. 2007) ("This means that
the 'UCC article II implied warranties gives a buyer of goods a potential cause of
action only against his immediate seller.'") (quoting *Mekertichian v. Mercedes-Benz
U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 832 (Ill. App. Ct. 2004)).  Nevertheless, the Court
does not have to decide this issue because even if Glasslam has privity, its breach of
implied warranty claim fails because Glasslam examined the tape before entering into
the contract.[7]

### b.  *Glasslam's Examination*

Tesa contends that because Glasslam had an opportunity to test and examine

---

[7]Furthermore, it appears, although Glasslam does not argue and has
therefore waived the right to pursue this theory, that Glasslam could potentially
bring this claim even if it was not in privity with Tesa.  See *Spiegel v. Sharp
Elecs. Corp*. 125 Ill. App. 3d 897, 900 (Ill. App. Ct. 1984) (recognizing the narrow
exception in which recovery of economic loss may be had on a warranty theory in
the absence of privity where a "remote manufacturer knows 'the identity, purpose
and requirements of the dealer's customer and manufactured or delivered the
goods specifically to meet those requirements.'") (citing *Crest Container Corp. v.
R.H. Bishop Co.*, 111 Ill. App. 3d 1068, 1076 (Ill. App. Ct. 1982)); *Frank's Maint.
& Eng'g, Inc. v. C. A. Roberts Co.*, 86 Ill. App. 3d 980, 992-93 (Ill. App. Ct. 1980)
("[G]enerally privity only extends to the parties to the sale and implied warranties
are not applicable between the buyer and a remote manufacturer" but "[t]his is not
true, however, where there is a direct relationship between the manufacturer
where, as here, the manufacturer knew the identity, purpose and requirements of
the dealer's customer and manufactured or delivered the goods specifically to
meet those requirements."); *Rhodes Pharmacal Co. v. Continental Can Co.*, 72
Ill. App. 2d 362, 373 (Ill. App. Ct. 1966) ("We hold, therefore, that the implied
warranty of fitness imposed by law on a manufacturer may be enforced directly
against the manufacturer by a third-party user, where, as alleged in the instant
case, the manufacturer (1) was aware of the purpose for which the product was to
be put, and (2) knew of the third-party user's reliance that the product would be fit
for the purpose intended.").

the tape to ensure fitness for its particular purpose before it purchased the tape from Budnick, Glasslam's implied warranty claim is excluded as a matter of law. Glasslam suggests that "[b]ecause [Glasslam] fully tested the Tesa red-liner 4965 tape, but based upon the assurances of Tesa refrained from testing the Tesa white-liner 4965 tape, reasonable examination under the circumstances would have not revealed the defect of the white-liner tape."  Glasslam asserts that *Trans-Aire Int'l, Inc. v. N. Adhesive Co.*, 882 F.2d 1254, 1256 (7th Cir. 1989), "accentuates the injustice that would result if Tesa is not held accountable for its false assurances."

The UCC provides that "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him."  810 ILCS 5/2-316.

In *Trans-Aire Int'l, Inc.*, the plaintiff, a company that converted ordinary vans into recreational vehicles, purchased an adhesive from the defendant, a manufacturer of a wide range of adhesive products, to laminate various materials during the process of converting standard automotive vans to recreational vehicles.  The plaintiff originally contacted the defendant to find a replacement to an adhesive manufactured by 3M Company that was not sustaining well when the temperature inside their vans rose.  The defendant sent several samples to the plaintiff for experimentation purposes and allegedly told the plaintiff that one of their adhesives – the 7748 – was a "match" for the 3M product which had previously failed.  The plaintiff tested the sample adhesives in a cool plant, rather than under the warmer weather conditions

that had caused the 3M product to fail, and determined that defendant's 7748 was better than the 3M product. The plaintiff's chief engineer suggested to the company's president to test the 7748 in summer-like conditions but ultimately no further testing was done. The defendant informed the plaintiff that was no warranty for the 7748. Nevertheless, the plaintiff ordered several shipments of the 7748 and began to use it in their vans. Sometime shortly thereafter, plaintiff learned that the 7748 had the same problems previously experienced with the 3M product, and the plaintiff had to repair over 500 vans. The plaintiff then brought suit against the defendant alleging numerous theories. Summary judgment was granted in favor the defendant and the plaintiff appealed.

On appeal, relying on § 2-316 of the Illinois UCC, the Court determined that the plaintiff excluded all implied warranties by its actions. *Trans-Aire Int'l, Inc.*, 882 F.2d at 1258. The Court noted that the plaintiff's former chief engineer tested the 7748 "as fully as it desired" and that he suggested that the plaintiff test the 7748 in warmer conditions, but the plaintiff's president believed the testing to be satisfactory for its applications. The court concluded as follows:

> A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe." [Citations]. [The Plaintiff] clearly knew that contact adhesives generally soften with heat; in addition to [its chief engineer's] general observations, it is undisputed that [the plaintiff] had experienced problems with another adhesive which it admits (and even argues in its favor) was a "match" for Adhesive 7448. We may only conclude that [the plaintiff's] actions and statements evidence a clear intent to waive any reliance upon the implied warranties. We therefore hold that [the plaintiff] cannot now maintain claims for breach of any existing implied warranties of fitness for a particular purpose or of merchantability and

that summary judgment was appropriate.

*Id.* at 1259.  Here, Mr. Howes explained that the reason he did not test the 4965 with the white liner was because it was presented to him as the same tape with a different liner and he had already tested the tape.  (Doc. 97-1, p. 18).   Nevertheless, it is undisputed that Glasslam had the opportunity to test the tape, that Glasslam signed the "first article sample approval" form that indicated that the sample of white tape shipped to him tested on a trial run that his requirements and was suitable for this application (Doc. 97-21), and that Glasslam knew that it was required to test the tape and admitted that is was always the customer's obligation to do so.  Like in *Trans-Aire*, Glasslam clearly knew that the tape may outgass but chose not test the tape again because he assumed that the red and white tape were the same.  *Id.* at 1259.  This assumption turned out to be incorrect but it does not negate the fact that before entering into the contract Glasslam examined the goods as fully as it desired or refused to examine the goods.  See 810 ILCS 5/2-316.  The fact of the matter is that the red and white tape were different products and Glasslam knew that it was its responsibility to test the tape for its application.  Glasslam relied on its own business judgment in deciding not to test the white tape under the same conditions it tested the red tape and as a result there is no implied warranty.  See *Trans-Aire Int'l, Inc.*, 882 F.2d at 1259; *Alberts Bonnie Brae, Inc. v. Ferral*, 188 Ill. App. 3d 711, 715 (Ill. App. Ct. 1989) ("There is no implied warranty of fitness for a particular purpose where the buyer has had a reasonable opportunity to examine the goods for defects prior to their acceptance under the sale contract.").   Thus, there are no genuine

issues of material fact with regard to Glasslam's claim for breach of implied warranty and Tesa is entitled to judgment as a matter of law.

### 3. Breach of Contract for the Benefit of a Third Party

In its third count, Glasslam alleges that Tesa entered into a contract with Budnick for the production of adhesive acrylic tape to be used in the manufacture of insulated glass units by Glasslam; that Tesa knew that its agreement with Budnick was for the benefit of Glasslam; that Tesa breached its agreement with Budnick by failing to manufacture and provide adhesive acrylic tape that was fit for its use in the production and manufacture of a rubber spacer to be used in the manufacture of the insulated glass units; and that as a direct and proximate cause of Tesa's breach, Glasslam has suffered damages.

Tesa asserts that Glasslam's breach of warranty claims have been disclaimed as a matter of law in accordance with 810 ILCS 5/2-316 by virtue of Tesa's terms and conditions.  Citing to an Illinois district court case, *R & L Grain Co. v. Chi. E. Corp.*, 531 F. Supp. 201, 209-10 (N.D. Ill. 1981), Tesa argues that "regardless of whether [Glasslam] couches its claim as a direct warranty claim (Count II) or as a third-party claim (Count III), summary judgment is appropriate because Tesa disclaimed the implied warranties that Nebula seeks to assert in both Counts."[8]  Glasslam contends that "[a]s a matter of public policy, enforcing a merchant's warranty disclaimer

---

[8]While the district court case may very well be a well-reasoned decision, it is not precedent for this Court and the Court does not rely on it its decision despite Tesa's repeated references to it.  See *Midlock v. Apple Vacations W., Inc.*, 406 F.3d 453, 457-58 (7th Cir. 2005).

against a third-party buyer who took no part in negotiating the terms and conditions of sale would be both procedurally and substantively unconscionable."

"The law of Illinois is that third-party beneficiary status may only be conferred where the identification of the third party to be benefited [sic] is clear and the benefit to him is direct." *Spiegel v. Sharp Elecs. Corp.* 125 Ill. App. 3d 897, 902 (Ill. App. Ct. 1984).  Citing to *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498, 501 (Ill. 1931), Glasslam argues that a genuine issue of material fact exists as to whether the third-party benefit resulting to Glasslam was direct or incidental; if it was direct, then Glasslam argues it may sue on the contract.

Here, the Court need not decide whether a question of fact exists regarding whether Glasslam has third-party beneficiary status because even assuming Glasslam does, its claim fails for two reasons.  First, as mentioned above, Glasslam had the opportunity to exam the tape prior to entering into the contract, and second, by virtue of being a third-party beneficiary to the contract between Budnick and Tesa, Glasslam would be bound by the contract between those parties and this claim would be barred under that agreement.  See *Parrett*, 346 Ill. at 258 ("The rule is, that the right of a third party benefited [sic] by a contract to sue thereon rests upon the liability of the promisor, and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed.  The liability so appearing cannot be extended or enlarged on the ground, alone, that the situation and circumstances of the parties justify or demand further or other liability."); *Chi. White Metal Casting, Inc. v. Treiber*, 162 Ill. App. 3d 562, 569 (Ill. App. Ct. 1987)

("[A] party relying on a third-party beneficiary theory must take the contract as the original parties made it and is bound by all of its provisions."); *L.B. Herbst Corp. v. N. Ill. Corp.*, 99 Ill. App. 2d 101, 105 (Ill. App. Ct. 1968) ("[I]f the plaintiff is relying on a third-party beneficiary theory, then it is clear that he must take the contract as the original parties made it. . . .  He cannot take those parts of the contract which favor him and reject those parts which distress him.").

Here, Tesa's terms and conditions would apply to the agreement between Budnick and Tesa.  Those terms and conditions provide the following warranty disclaimer:

> **13.    WARRANTY DISCLAIMER: THE FOREGOING LIMITED EXPRESS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, AND TESA TAPE EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS ON** [sic] **IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ANY WARRANTY OF NON-INFRINGEMENT, AND ANY WARRANTY ARISING FROM ANY COURSE OF DEALING, USAGE OR TRADE PRACTICES.**  Any information, recommendations and descriptive information furnished by tesa tape do not, and shall not, constitute a warranty.  The Goods are sold upon the understanding that Buyer will independently determine the suitability of the Goods for its purposes.  All properties of the Goods described in tesa tape price lists, catalogs and other descriptive materials are averaged values, and should not be used in determining specifications or use of such Goods by Buyer."

(Doc. 99-3, p. 2).  Thus, Glasslam's claims would be excluded by Tesa's terms and conditions.  See 810 ILCS 5/2-315 ("Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods,

there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.").[9]

Glasslam contends that "[a]s a matter of public policy, enforcing a merchant's warranty disclaimer against a third-party buyer who took no part in negotiating the terms and conditions of sale would be both procedurally and substantively unconscionable."   The Court disagrees and fails to see how it would be unconscionable to apply the terms entered into by the parties to a party with third-party beneficiary status.   See *L.B. Herbst Corp.*, 99 Ill. App. 2d at 105 ("[I]f the plaintiff is relying on a third-party beneficiary theory, then it is clear that he must take the contract as the original parties made it. . . .   He cannot take those parts of the contract which favor him and reject those parts which distress him."). Accordingly, Tesa is entitled to summary judgment as to this claim as well.

## IV.  Conclusion

For the reasons stated above, Glasslam's appeal is denied, Budnick's motions for summary judgment are granted, and Tesa's motions for summary judgment are granted.  As mentioned previously, the Court orders Glasslam to file a supplemental

---

[9]The Court notes that under Tesa's terms and conditions, it states that North Carolina applies.  The Court finds that the same result would be reached applying either Illinois or North Carolina law because the disclaimer meets the requirements of the statute.  See N.C. GEN. STAT. § 25-2-316; *Lee v. R & K Marine, Inc.*, 598 S.E.2d 683, 686 (N.C. Ct. App. 2004) (finding that the trial court did not err in granting defendant's motion for summary judgment on plaintiff's breach of warranty claim where the disclaimer met the requirements of N.C. Gen. Stat. § 25-2-316(2) and was conspicuous as defined by N.C. Gen. Stat. § 25-1-201(1)).  North Carolina also contains an identical statutory provision with regard to examining the product.  See N.C. GEN. STAT. § 25-2-316(3)(b).

brief addressing the amount of damages to which Budnick is entitled within fourteen days of the date of this order.   Budnick shall have seven days from the date Glasslam's brief is filed to respond thereto.

**IT IS SO ORDERED.**

Signed this 30th day of March, 2012.

David R. Herndon
2012.03.30
20:58:50 -05'00'

**Chief Judge**
**United States District Court**